## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                            )
**VICTORIA DOMENICHETTI,**      )
                            )
       **Plaintiff,**          )
                            )     **Civil Action No.**
       **v.**                )     **12-11311-FDS**
                            )
**THE SALTER SCHOOL, LLC;**    )
**PREMIER EDUCATION GROUP, LP; and** )
**DAVID PALMER,**            )
                            )
       **Defendants.**       )
_____)

## MEMORANDUM AND ORDER ON DEFENDANTS'
## MOTION TO DISMISS AND COMPEL ARBITRATION

**SAYLOR, J.**

      This is an action alleging unlawful interference and retaliation in violation of the Family

and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et. seq*.  Plaintiff Victoria Domenichetti

contends that her employer, The Salter School, LLC; its owner, Premier Education Group, LP;

and her former supervisor, David Palmer, interfered with her request for maternity leave under

the FMLA and retaliated against her by passing her over for promotion and demoting her to a

part-time position.

      The issue before the Court is whether this dispute is subject to arbitration.  Defendants

have moved to compel arbitration and to stay or dismiss the litigation.  Defendants contend that

plaintiff signed an agreement requiring that this dispute be submitted to arbitration.  Plaintiff

contends that she did not agree to arbitrate such claims, because any alleged arbitration

agreement was contained within a non-contractual employee handbook and is unenforceable.

For the reasons stated below, the motion to compel arbitration will be denied.

I.      **Factual Background**

      A.      **Domenichetti's Employment**

Victoria Domenichetti began working at the Salter School on January 10, 2011.  (Compl.

¶ 12).  The Salter School is a two-year, for-profit school located in Fall River, Massachusetts,

that provides career education in various health-related fields.  (*Id.* at ¶ 2; Anjos Decl. ¶ 3).

Premier Education Group owns and operates the Salter School.  (Compl. ¶ 3).  Domenichetti

worked as an externship coordinator and was responsible for placing students in on-the-job

settings to gain practical skills.  (*Id.* at ¶ 13).  Each student at the Salter School must complete an

externship as a graduation requirement.  (*Id.* ¶ 14).

Premier is a covered employer under the FMLA.  (*Id.* at ¶¶ 44, 11).  Within months of

starting of her job, Salter asked Domenichetti to train approximately five fellow externship

coordinators.  (*Id.* at ¶ 15).  Premier informed Domenichetti that she would be rewarded for

training the externship coordinators with a raise after her annual evaluation.  (*Id.* at ¶ 16).  At all

times, Domenichetti's work was above average, and she never received a written or verbal

warning.  (*Id.* at ¶¶ 17, 19-20).  In January 2012, Domenichetti received an annual performance

rating report stating that her work performance had exceeded expectations.  (*Id.* at ¶ 18).

On May 1, 2012, Domenichetti informed Jennifer Brown, Premier's Human Resources

and Payroll Director, that she was pregnant and requested information on the company's

maternity-leave policy.  (*Id.* at ¶¶ 21-22).  On June 13, Domenichetti submitted her FMLA

paperwork to Brown, requesting time off to care for her newborn.  (*Id.* at ¶ 25).  At that time,

Domenichetti had worked twelve months and for at least 1,250 hours of service with Premier and

had not previously requested maternity leave.  (*Id.* at ¶¶ 24, 26).

Later that day, on June 13, Domenichetti's peer and fellow externship coordinator, Erin

Groves, was promoted to Director of Career Services.  (*Id.* at ¶ 28).  At the time of her

promotion, Groves had less experience than Domenichetti in career services.  (*Id.* at ¶¶ 28-29).

On June 18, David Palmer, campus president of the school, e-mailed Domenichetti to inform her

she was being transferred to a part-time position.  (*Id.* at ¶ 30).  Premier reduced Domenichetti's

schedule to 20 hours per week; her part-time status resulted in reduced benefits.  (*Id.* at ¶¶ 30-

31).  Premier contended that Domenichetti's demotion was due to a decreasing student

population.  Domenichetti contends that the school's enrollment had not materially decreased

and that the equally attended New Bedford campus had not undergone similar cuts to the

externship coordinator staff.  (*Id.* at ¶¶ 51-54).

### B.    The Employee Handbook

Domenichetti's first day of employment was January 10, 2011.  That day, she signed a

"Receipt & Acknowledgment of Premier Education Group Employee Handbook."  (Docket No.

6, Ex. B; Domenichetti Aff. ¶ 3).  Premier Education Group requires that each new employee,

including all Salter School employees, receive the Premier Employee Handbook, and

acknowledge receipt of that handbook.  (Anjos Decl. ¶ 4, 6).  As of January 10, 2011, the most

current version of the Employee Handbook was the 2004 version.  (*Id.* at ¶ 5).

The 2004 Handbook contains 55 pages.  (Docket No. 13, Ex. A) ("Handbook").  The

Handbook articulates company policies under 22 headings, with various subheadings.  (*See id*. at

1-3).  On page eight, the Handbook instructs, under the heading "Employment," "NOTHING IN

THIS HANDBOOK CONSTITUTES A PROMISE OR GUARANTEE AS TO THE TERMS

AND CONDITIONS OF YOUR EMPLOYMENT WITH PREMIER." (*Id.* at 8) (emphasis in

original).  Defendants acknowledge that the Handbook is not a contract.  (Def. Reply Mem. 2).

Premier makes its employees aware that it maintains the authority to alter the policies contained

within the Handbook at its discretion.  (*See* Handbook at 5, 8, 53).  Domenichetti contends that

she did not negotiate the terms of the Handbook, and was not given the opportunity to do so

before signing and acknowledging her receipt of the Handbook.  (Domenichetti Aff. ¶¶ 2-3).

She also contends that Premier did not direct any special attention to the Handbook.  (*Id.* at ¶ 4).

### 1.    The Dispute Resolution Policy

The Handbook contains a "Dispute Resolution Policy" that governs the resolution of

"Covered Disputes" arising from the employment agreement.  (*See* Handbook at 49-52).

According to the Handbook, Premier adopted its Dispute Resolution Policy in order to provide

"an efficient and mutually beneficial" system of resolution.  (*Id.* at 49).  The Dispute Resolution

Policy states that the employee and employer both make mutual promises to one another to agree

"[t]o be bound by the Grievance and Arbitration Procedure," "[t]hat any Covered Dispute be

submitted first to the Grievance Procedure," and that each party "[n]ot . . . seek any relief or

make any claim for damages by bringing or filing any action, claim, or charge relating to any

Covered Dispute with any court or administrative agency." (*Id.* at 49-50).  The policy later

states that these mutual promises "are given in exchange for commitments to which the parties

are not otherwise entitled."  (*Id.* at 51).

Subsection 3(a) of the Dispute Resolution Policy defines the term "Covered Dispute" as

"any claim that the employer has violated the employee's rights under any federal, state, or

municipal constitution, statute, regulation, common law or ordinance" and applies to "any claims

for discrimination[,] including but not limited to, discrimination based on sex [or] pregnancy . . .
." (*Id.* at 50).  The term "Covered Dispute" extends to "any claims by or against Premier
Education Group, subsidiary or affiliated entities, their successors, assigns, predecessors or any
of their officers, employees or agents." (*Id.*).  Subsection 5 states as follows:

> Premier Education Group and the employee agree that this [Dispute Resolution
> Policy] sets forth the complete agreement of the parties on the subject matter
> covered by this Dispute Resolution Policy, and supersedes any prior or
> contemporaneous oral or written understanding of this subject.  Both parties
> represent that neither is relying on any representations, whether oral or written, on
> the subject matter covered by, the effect, enforceability, meaning, or any other
> matter relating to this [Dispute Resolution Policy], except as specifically set forth
> herein.

(*Id.* at 51).  The agreement then outlines the appropriate procedure for resolving a grievance.
(*See id.* at 51-52).

The Dispute Resolution Policy did not have a signature line on the bottom of its last
page.  (*See id.* at 52).  Premier did not present the policy in a separate document from the
Handbook.

### 2.     **Receipt and Acknowledgment**

The "Receipt & Acknowledgment of Premier Education Group Employee Handbook"
page appears in the Handbook on the page following the Dispute Resolution Policy.  (*See id.* at
53).  The Receipt & Acknowledgment page states that "the Handbook is intended to provide an
overview of the company's current policies," and that "the contents of this Handbook may be
changed at any time at the discretion of Premier Education Group." (*Id.*).

The same page instructs the employee to read the following statements and sign to
"indicate your receipt and acknowledgment" of the handbook.  (*Id.*).  The section contains seven
bulleted sentences that appear above the employee signature line.  The first sentence

acknowledges receipt of the Handbook.  The second bulleted sentence reads, "I have read and understand the [Dispute Resolution Policy] and agree to the resolution of any covered dispute in accordance with that Policy." (*Id.*).  The third and fourth bulleted sentences state that the employment relationship between the employer and employee is at will.  The fifth bulleted sentence relates to confidential information learned through the course of employment and instructs the employee not to use such information for improper purposes.  The sixth bulleted sentence states "I understand that, should the content of this Handbook in any way change, Premier Education Group may require an additional signature from me to indicate that I am aware of and understand any new policies." (*Id.*).  The last sentence states that a signature "indicates that I have read and understand the above statements and have received a copy of the . . . Handbook." (*Id.*).

On January 10, 2011, Domenichetti signed the Receipt & Acknowledgment page. Following the Receipt & Acknowledgment page, the Handbook contains two additional pages. Page 54 outlines the company's drug and alcohol abuse prevention policy and disciplinary procedures, and requires an additional signature from the employee.  Page 55 contains a "Conflict of Interest" section that makes the employee aware that a violation of its conflict of interest policy may result in disciplinary measures as articulated in the Disciplinary Section and also requires an additional employee signature.

## II.    <u>Procedural History</u>

On July 18, 2012, Domenichetti instituted the present action against Premier, the Salter School, and Palmer.  The complaint alleges that defendants' decision to demote Domenichetti to a part-time position interfered with her right to take FMLA leave to care for her newborn and

prevented her from returning to the same position she held before exercising her FMLA rights in violation of 29 U.S.C. § 2615(a)(1) and 29 C.F.R. § 825.220(c). (Compl. ¶ 47). The complaint also alleges that the decision to pass her over for promotion and demote her to a part-time position was retaliation for her request to take maternity leave in violation of 29 U.S.C. § 2615(a)(2), and that defendants' offered reason for her demotion was pretextual. The complaint seeks equitable and injunctive relief, as well as monetary damages. (Compl. ¶¶ 21-23). Defendants have moved to compel arbitration and for dismissal after referral to arbitration, or, in the alternative, to stay the litigation pending the conclusion of arbitration.

## III.   Legal Standard

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., governs the enforcement of written arbitration agreements. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (holding that the FAA extends to employment cases for employees other than those engaged in transportation). It was enacted in order to reverse longstanding judicial hostility to arbitration agreements and to "place such agreements upon the same footing as other contracts." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 271 (1995) (citation and internal quotation omitted); *accord AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745-1746 (2011). When "construing an arbitration clause, courts and arbitrators must 'give effect to the contractual rights and expectations of the parties.'" *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773-74 (2010) (citation omitted). The federal policy of favoring arbitration "does not totally displace ordinary rules of contract interpretation." *Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 266 F.3d 15, 25 (1st Cir. 2000). Any ambiguities in arbitration agreements must be construed against the drafter. *Id.*

7

"A party who is seeking to compel arbitration must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011) (internal citations and quotations omitted). "When an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration of the parties, 9 U.S.C. § 3, or compelling the parties to arbitrate, 9 U.S.C. § 4." *DeLuca v. Bear Stearns & Co.*, 175 F. Supp. 2d 102, 106-07 (D. Mass. 2001).

To determine whether an agreement to arbitrate exists, federal courts generally "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under Massachusetts law, an employee handbook or personnel manual may form the basis of a contract. *See Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 415 (1988) (citation omitted). However, "[p]ersonnel handbooks do not have uniform legal significance; the import of such handbooks varies according to a multitude of factors." *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 558 (1st Cir. 2005). Under Massachusetts law, courts must consider (1) whether the employer "retain[s] the right to modify unilaterally the personnel manual's terms;" (2) whether the manual's language states that its purpose is to "provid[e] guidance to company policies;" (3) whether there was "any negotiation over the terms of the personnel manual;" (4) whether there was "any special attention called to the manual by the [employer];" and (5) whether the "[employee] signed the manual, or in any way manifested his assent to it or acknowledged that he understood its terms." *Jackson*, 403 Mass. at 14-15 (internal citations and quotations omitted).

Even in cases where the employee has acknowledged his or her receipt of an arbitration agreement—either independently or contained within an employee handbook—courts have found the obligation to arbitrate unenforceable when the employer retains the unilateral right to change the terms of the agreement because such a right renders any recited promise illusory. *See, e.g., Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 206 (5th Cir. 2012) (finding arbitration agreement contained within signed handbook illusory because "the agreement allows [the employer] to hold its employees to the promise to arbitrate while reserving its own escape hatch"); *Douglas v. Johnson Real Estate Investors, LLC*, 470 Fed. Appx. 823, 826 (11th Cir. 2012) (finding, under Massachusetts law, that employee's signed arbitration agreement was unenforceable because employer retained ability to unilaterally alter terms); *Dumas v. American Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) ("[A]n arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or scope is illusory."); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999) (employer's right to change terms of arbitration agreement in whole or in part without notice rendered agreement unenforceable); *Canales v. Univ. of Phoenix, Inc.*, 854 F. Supp. 2d 119, 124 (D. Me. 2012) (same).

## IV.    <u>Analysis</u>

The parties dispute whether plaintiff is contractually obligated to participate in arbitration. Defendants contend that while the Handbook itself is not a contract, the Dispute Resolution Policy contained within the Handbook is a separate and distinct binding agreement. Defendants contend that the mutual promises made between the employer and employee, set out on page 51 of the Handbook, establish sufficient consideration to create a contract. Defendants

further contend that the contract is enforceable because the Dispute Resolution Policy itself did

not contain a reserve clause that allowed defendants to modify the terms of the Policy.

Conversely, plaintiff contends that she did not agree to the Dispute Resolution Policy because

the Handbook is not a contract.  Plaintiff further argues that even if she did agree to the Dispute

Resolution Policy, it was a non-binding illusory promise, because defendants maintained the

right to alter or modify the terms of the Handbook, including the Dispute Resolution Policy, at

any time without her consent.

### A.    The Handbook Is Not a Contract

As noted, defendants concede that the Handbook is not a contractual agreement between

the parties.  (Defs. Reply Mem. at 2).  Defendants retained the unilateral right to alter the terms

of the Handbook without plaintiff's consent.  *See Jackson*, 403 Mass. at 14.  The Handbook

makes clear that its purpose is to provide guidelines to company employees.  *See id.*  Defendants

did not give plaintiff the opportunity to negotiate the terms of the Handbook and likewise did not

direct any special attention to the Handbook's import.  *See id.*  Although plaintiff signed the

Receipt & Acknowledgment page, that fact, standing alone, is not dispositive of contract

formation.  *See, e.g.*, *Snow*, 854 F. Supp. 2d at 124 (and cases cited).

### B.    The Dispute Resolution Policy Is Not Distinct from the Handbook

The Dispute Resolution Policy appears within the Handbook.  Defendants contend that

the executed Receipt & Acknowledgment page operated as a separate and distinct agreement

between the parties that gave effect to the terms of the Dispute Resolution Policy.  However, a

fair reading of the Receipt & Acknowledgment page and the Dispute Resolution Policy itself

dictates a different result.

The Dispute Resolution Policy has headings similar to all other sections of the Handbook and there is no particular emphasis placed on the policy.  The Dispute Resolution Policy does not require an additional employee signature.  While the Dispute Resolution Policy is mentioned in one sentence on the Receipt & Acknowledgment page, that reference is prefaced by the disclaimer that "the contents of this Handbook may be changed at any time at the discretion of Premier . . . ."  The specific reference to the Dispute Resolution Policy which states "I have read and understand the [Dispute Resolution Policy] and agree to the resolution of any covered dispute in accordance with that Policy," appears alongside six other bulleted sentences.  One of the later-bulleted sentences reemphasizes the unilateral right to modify the terms, stating ". . . should the content of this Handbook in any way change, Premier Education Group may require an additional signature from me to indicate that I am aware of and understand any new policies."

Furthermore, the Dispute Resolution Policy appears before the Receipt & Acknowledgment page, within the body of the Handbook itself.  It does not appear in an additional format or on an additional page.  In contrast, the Conflict of Interest and Alcohol Abuse Policies appear in a different format after the Receipt & Acknowledgment page; each requires an additional signature, arguably making them distinct from the Handbook itself.

At best, therefore, it is ambiguous whether defendants intended that the reservation of the right to modify the contract applied to the entire Handbook, or the entire Handbook with the exception of the Dispute Resolution Policy.  But ambiguities in arbitration agreements must be construed against its drafters.  *Paul Revere*, 226 F.3d at 25.  Accordingly, the Court will interpret the Handbook to grant defendants the unilateral discretion to alter the terms of the Dispute

Resolution Policy without having to notify plaintiff.  Such discretion makes any agreement, if one even existed, illusory and unenforceable.  *Carey*, 669 F.3d at 206.

In sum, defendants retained the ability to modify the terms of the Handbook at their discretion, without notice to plaintiff.  Because the Dispute Resolution Policy was a subsection of the Handbook, the power to modify terms also applied to the Dispute Resolution Policy.  Defendants thus had the power to require plaintiff to arbitrate the covered dispute, while simultaneously reserving the right to modify the agreement.  Such an agreement is not enforceable.  Accordingly, defendants are not entitled to arbitration and the motion to compel arbitration will be denied.

**V.**      **Conclusion**

For the foregoing reasons, defendants' motion to compel arbitration is DENIED.

**So Ordered.**


                                                    /s/ F. Dennis Saylor
                                                    F. Dennis Saylor IV
                                                    United States District Judge
Dated:  April 19, 2013